**BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN,**
Plaintiff-Appellant,

v.

**SOUTHERN PACIFIC COMPANY (TEXAS AND LOUISIANA LINES),**
Defendant-Appellee,

Brotherhood of Locomotive Engineers,
Party Defendant-Appellee.

No. 30803.

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1971.

William P. Fonville, Dallas, Tex., for plaintiff-appellant.

Marvin Menaker, Bader, Wilson, Menaker & Cox, Dallas, Tex., for Brotherhood of Loc. Engineers.

V. Reagan Burch, Jr., Baker & Botts, Houston, Tex., for Southern Pac. Co.

Before GOLDBERG, GODBOLD, and RONEY, Circuit Judges.

GOLDBERG, Circuit Judge:

In this labor case railroad brotherhoods, belying their names, engaged in fratricidal war involving their paterfamilias, the Southern Pacific Railroad. Congress, finding the courts ill-equipped to exercise Solomonic wisdom in these family disputes, derailed most judicial interventions by means of the Railway Labor Act. We therefore decline to interfere in this intramural controversy and remit the parties to the tribunal created by Congress for final arbitration.

## I.

For many years the railroad industry has recruited virtually all locomotive engineers from the ranks of locomotive firemen. This pattern has been adhered to on the Southern Pacific. Prospective Southern Pacific engineers are first employed as firemen and placed on the firemen's seniority roster. As the newly-hired firemen move up the seniority ladder within their craft, they learn the skills of an engineer. After prescribed periods of employment, these firemen are examined for engineering capabilities, and those who qualify, while retaining their firemen's seniority, are placed on the engineers' seniority roster and become eligible for promotion. Since openings in the engineering ranks are not normally available, employees who are newly qualified as engineers continue to work as firemen until the demand for active engineers has reached far enough down the seniority list of that craft to encompass them. Conversely, surplus engineers, who have retained their firemen's seniority, are termed "demoted engineers" and are entitled to displace firemen with less seniority. With fluctuations in the demand for engineers, the employees at the bottom of the engineer seniority list in effect "ebb and flow" between serving as engineers and as firemen.

Whether or not there is a surplus of engineers is determined by reference to various "boards" from which work assignments are made. Thus, engineers who work for the Company in freight service are assigned to either "pool freight boards" ("pool boards") or "extra boards." Assignments for regularly established runs are generally made from the pool board, while assignments involving work of an irregular or unpredictable nature are made from the group of engineers assigned to the extra board. Senior engineers are given preference in making assignments to the pool board, and, if a reduction in the number of engineers assigned to a board is required, it is to be in reverse order of seniority. When the size of a pool board is reduced, the excess engineers may choose to demote to the extra board or to take other jobs, such as yard work, available to them on a seniority basis. Engineers cut or displaced from an extra board may return to work as firemen.

In order to divide the available work equitably, it has long been a practice to establish mileage limitations which regulate on a mathematical basis the number of engineers assigned to any given board. These limitations are designed to maintain a desired ratio between the number of engineers on a board and the amount of work available to that board, so that the mileage, or the equivalent thereof, obtained by the engineers on the board falls within specified limits. If the average mileage obtained during a check period falls below a certain figure, the number of engineers on the board must be reduced. Conversely, if the average mileage exceeds a certain figure, the number of engineers on the particular board must be increased. Moreover, it has been a general practice to limit the number of miles per month an individual engineer is permitted to run. Once this limit is reached, the individual remains out of service until the beginning of the next month.

Both the engineers' and the firemen's unions [1] have included in their collective agreements with Southern Pacific provisions regulating the progress of employees from fireman to engineer, including the process of "ebb and flow" for those employees near the bottom of the engineer list and near the top of the fireman list. Of particular relevance is an agreement executed on April 1, 1940, whereby the Southern Pacific and the

---

1. The engineers' union, at the time of suit, was the Brotherhood of Locomotive Engineers (herinafter referred to as the Engineers). The firemen, on the other hand, were represented by the Brotherhood of Locomotive Firemen and Enginemen, now a division of the United Transportation Union (hereinafter referred to as the Firemen).

Engineers, *inter alia*, devised particular mathematical ratios to govern board assignments. Specifically, that agreement provided that if engineers on a pool board averaged less than 3200 miles in freight service per month, the number of engineers on that board must be reduced. If the average monthly mileage exceeded 3800 miles, the number of board engineers was to be increased. Individual engineer mileage was also limited to 3800 miles.

Under the Engineers' mileage limitation agreements it was the practice to have local chairmen, drawn from the ranks of the Engineers, see that the mileage regulations were observed. Because of dissatisfaction with this system, local chairman having violated the agreements by permitting particular engineers to run over their maximum mileage, the Firemen served a formal 30-day notice on Southern Pacific under § 6 of the Railway Labor Act, 45 U.S.C.A. § 156 [2], for negotiation of a rule specifying the conditions under which demoted engineers may return to service as firemen. On December 30, 1956, these negotiations culminated in the execution of a Mediation Agreement between the Southern Pacific and the Firemen under the auspices of the National Mediation Board. This agreement provided:

"(a) That the mileage rules and regulations now in effect providing conditions under which demoted engineers flow to and from firing service shall continue in full force and effect (NOTE: Mileage limitations are: passenger 4000–4800; freight 3200–

3800; extra list 3000–3800; yard 35 days. Ten-day checks.)

(b) The Company will see that the aforesaid mileage rules and regulations are properly applied.

(c) The Company will furnish each Local Chairman and the General Chairman check of mileage of enginemen as soon as available upon the completion of each payroll period."

The mileage rules and regulations referred to in this agreement, which were in effect on December 30, 1956, were those provided in the 1940 Mileage Limitation Agreements between Southern Pacific and the Engineers.

Other than actually running the trains, engineers engage in other time-consuming activities such as initial terminal delay, final terminal delay, initial terminal switching, final terminal switching, and held-away-from-home terminal time. Denominated "arbitraries," these activities are best measured in hours and minutes, but, for various purposes, including compensation, are converted at a particular rate to their equivalent in miles per hour for work performed. At the time the 1956 Firemen's Agreement was executed there had been some confusion between the Engineers and Southern Pacific as to whether or not arbitraries were to be included as "equivalent mileage" in computing mileage limitations under the 1940 Agreement. Therefore, on March 18, 1957, the Southern Pacific and the Engineers, under the auspices of the National Mediation Board, entered into a Mediation Agreement in which the

---

2. That section provides:
   "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board. May 20, 1926, c. 347, § 6, 44 Stat. 582; June 21, 1934, c. 691, § 6, 48 Stat. 1197."

parties agreed that the proper application of the mileage rules and regulations required, *inter alia,* the inclusion of arbitraries.

With certain exceptions, this practice of including arbitraries was followed until October 9, 1968, when the Engineers, after service of a section 6 notice on the Company, entered into an agreement with Southern Pacific which specifically excluded arbitraries, as of November 1, 1968, in computing mileage for the regulation of the lists of engineers in pool freight service. This agreement affected only the regulation of the size of engineer freight pool boards and did not purport to affect any computations regarding engineer extra boards. Arbitraries, therefore, were still to be included in computing total mileage accumulated by individual engineers on either pool or extra boards and in regulating the size of engineer extra boards.

On November 4, 1968, the Firemen filed an action in federal district court seeking to enjoin the Southern Pacific from effectuating the 1968 Engineer Agreement on the ground that such agreement represented a change in the Firemen's 1956 Agreement without exhaustion, with regard to the Firemen, of the notice and bargaining procedures of the Railway Labor Act. The Engineers' union intervened, and, on June 24, 1970, the district court, finding that judicial interference was improper, rendered judgment for defendant Southern Pacific.

### II.

■ The basic purpose of the Railway Labor Act is "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C.A. § 151a.[3] To this end Section 2, First of the Act, 45 U.S.C.A. § 152, First, imposes the general duty on both parties "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and work-

ing conditions * * *" and erects elaborate machinery for dispute resolution. More specifically, the Act provides procedures (1) to aid in the resolution of disputes arising from proposed changes in a collective bargaining agreement, and (2) for the determination of grievances arising over the interpretation or application of the agreement. Although the Act did not expressly label these two categories of controversies, they are commonly referred to as "major" and "minor" disputes, respectively, and lead to quite different procedural consequences. *See* Elgin, J. & E. Ry. Co. v. Burley, 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886. While in both types of disputes the parties are first required to attempt a voluntary settlement, § 2, Second, 45 U.S.C.A. § 152, Second, if no agreement is reached the settlement procedures as to each diverge. If the controversy is denoted as "major," that is, a dispute arising out of proposals for a new contract or for changes in existing agreements, the parties first go to mediation (§ 5, First, 45 U.S.C.A. § 155, First); if that fails, to acceptance or rejection of arbitration (*Id.*); and finally to possible Presidential intervention (§ 10, 45 U.S.C.A. § 160). Moreover, while the Act's bargaining procedures are being exhausted, the union is prevented from striking and the carrier is prohibited from doing anything that would justify a strike. Detroit & T.S.L. R.R. Co. v. United Transp. Union, 1969, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325; *see* Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344. To this end the Act establishes three status quo provisions, each covering a different stage of the major dispute settlement procedures. As described by the Supreme Court:

"* * * Section 6, the section of immediate concern in this case, provides that 'rates of pay, rules, or working conditions shall not be altered'

---

3. For a critical but comprehensive discussion of the Act, see Risher, The Railway Labor Act, 12 B.C.Ind. & Com.L.Rev. 51 (1970).

during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board. Section 5, First, provides that for 30 days following the closing of Mediation Board proceedings 'no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose,' unless the parties agree to arbitration or a Presidential Emergency Board is created during the 30 days. Finally, § 10 provides that after the creation of an Emergency Board and for 30 days after the Board has made its report to the President, 'no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose.' These provisions must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by § 2, First, 'to exert every reasonable effort' to settle disputes without interruption to interstate commerce.

"While the quoted language of §§ 5, 6, and 10 is not identical in each case, we believe that these provisions, together with § 2, First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30-day 'cooling-off' period. Although these three provisions are applicable to different stages of the Act's procedures, the intent and effect of each is identical so far as defining and preserving the status quo is concerned. The obligation of both parties during a period in which any of these status quo provisions is properly invoked is to preserve and maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." Detroit

& T. Shore Line R.R. Co. v. United Transp. Union, 1969, 396 U.S. 142, 150–153, 90 S.Ct. 294, 299, 24 L.Ed. 2d 325 (footnotes omitted).

Once these procedures are exhausted, however, compulsory processes are at an end, and either party may resort to self-help or unilateral action. *See, e. g.,* Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344. No authority is empowered to decide the dispute unless the parties jointly agree to arbitration.

█ Conversely, if the dispute is a "minor" one, that is, a controversy arising over the interpretation or application of an existing collective agreement, either party, upon impasse, may submit the grievance to final and binding arbitration before the National Railroad Adjustment Board or a system board of adjustment established by the parties, § 3, First (m), Second, 45 U.S. C.A. § 153, First (m), Second. While resort to self-help, such as strikes, is precluded in minor disputes, *see e. g.,* Brotherhood of Railroad Trainmen v. Chicago River & Ind. R.R., Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Railway Express Agency, Inc. v. Brotherhood of Railway, Airline, and Steamship Clerks, etc., 5 Cir. 1971, 437 F. 2d 388; Flight Engineers Intern. Ass'n v. American Airlines, Inc., 5 Cir. 1962, 303 F.2d 5, there is no general provision in the Act prohibiting a party from acting unilaterally upon its interpretation of the contract pending exhaustion of the grievance procedures. *See, e. g.,* Switchmen's Union of North America v. Central of Georgia Ry. Co., 5 Cir. 1965, 341 F.2d 213, cert. denied, Brotherhood of Locomotive Firemen and Enginemen v. Central of Georgia Ry. Co., 382 U.S. 841, 86 S.Ct. 41, 15 L.Ed.2d 82; Hilbert v. Pennsylvania R.R. Co., 7 Cir. 1961, 290 F.2d 881, cert. denied, 1961, 368 U.S. 900, 82 S.Ct. 174, 7 L.Ed. 2d 96.[4]

4. Several courts have held, however, that even though the Act does not expressly

require preservation of the status quo in a minor dispute, a district court, in its

A primary problem, then, in dispute resolution under the Act is to determine whether a given controversy is "major" or "minor." The Firemen contend that the present controversy is a major dispute, which, absent exhaustion of the bargaining provisions of the Act, requires the parties to maintain the status quo. Basically the Firemen argue that by contracting with the Engineers to exclude arbitraries from the computation of pool board mileage limitations, the Southern Pacific unilaterally altered a "rule" embodied in the 1956 Firemen's Agreement without bargaining pursuant to section 6. Since the carrier therefore violated the command of section 2, Seventh, 45 U.S.C.A. § 152, Seventh, that "rates of pay, rules, or working conditions" may not be changed without following the procedures of section 6, the Firemen request that the unilateral agreement with the Engineers be enjoined under well established precedents. *See, e. g.,* Order of R.R. Telegraphers v. Chicago & N. W. Ry. Co., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774.

██ It is true that in Order of Railway Conductors & Brakemen v. Switchmen's Union, 5 Cir. 1959, 269 F.2d 726, cert. denied, 361 U.S. 899, 80 S.Ct. 206, 4 L.Ed.2d 155, we held that where a carrier alters the terms of an existing collective agreement between it and one union by contracting with a second union, a federal district court at the behest of the first union has jurisdiction to enjoin the enforcement of the subsequent agreement as a violation of section 2, Seventh, and section 6 of the Act. However, as Southern Pacific and the Engineers point out, we also held in *Switchmen's Union* that section 6 notice and bargaining is required only as to unions which have presently effective representational rights over the matters at issue. In *Switchmen's Union* the court was concerned with the validity of a contract consummated between a bargaining representative certified by the National Mediation Board pursuant to § 2, Ninth, 45 U.S.C.A. § 152, Ninth, and the carrier. That agreement effected a change in rules embodied

---

equitable discretion, may grant injunctive relief against unilateral action on a showing of threatened irreparable injury after the dispute has been submitted to the Adjustment Board. International Brotherhood of Teamsters, etc. v. Braniff Intern. *Airways, Inc.,* 5 Cir. 1971, 437 F.2d 1272; Local Lodge 2144, etc. v. Railway Express Agency, Inc., 2 Cir. 1969, 409 F.2d 312; Westchester Lodge 2186, etc. v. Railway Express Agency, Inc., 2 Cir. 1964, 329 F.2d 748; see Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. R. Co., 1960, 363 U.S. 528, 531 n. 3, 80 S.Ct. 1326, 4 L.Ed.2d 1379. The theory supporting this view is that where the effect of unilateral action, even if based on an interpretation of a collective agreement, would be so severe as to render any ultimate victory by the other party before the Board a pyrrhic one, a court should be able to enjoin such action in the name of preserving the primary jurisdiction of the Board.

In the instant case the Firemen simply argue that unilateral action by Southern Pacific is impermissible because the dispute is a "major" one, which, under the Act, the parties are required to attempt to resolve while preserving the status quo.

There has been no attempt to demonstrate that if the dispute be "minor," implementation of the 1968 Engineers' Agreement would nevertheless irreparably damage the Firemen. Indeed, the district court below found that

"[s]ince November 1, 1968, the date the agreement went into effect, the total number of employees required to fill all engineer pool board assignments has been reduced to some extent. It does appear, however, that the total miles of engineer work performed and paid for by the Company has not been affected. Also, there is evidence of an increase in the amount of work performed by engineers on extra boards rather than pool boards. No employee has been laid off by the Company, nor is any layoff likely, as a result of application of the 1968 agreement between the BLE [Engineers] and the Company."

In this light we need not consider the applicability of the above cases, but instead simply apply the general rule that a party to a "minor" dispute, while it must bargain in good faith, may act unilaterally on its interpretation of the contract until told to do otherwise in a final arbitral decision.

in an earlier agreement between the carrier and a union which had formerly represented the employees in the craft involved. We held that the more recently certified bargaining representative had the exclusive right to contract for the craft involved, and that the changes effected by such latter agreement in the contract between the carrier and the former bargaining representative did not require notice to and negotiation with that former representative. Southern Pacific and the Engineers point out that in the instant case, contrary to the situation in *Switchmen's Union* there is no clear-cut delineation of bargaining rights over inclusion or exclusion of arbitraries. Both the Firemen and the Engineers are Board-certified representatives of their respective crafts. The present dispute, therefore, is in essence a "jurisdictional dispute—an asserted overlapping of the interests of the two crafts." General Committee of Adjustment, etc. v. Missouri-Kansas-Texas R.R. Co., 1943, 320 U.S. 323, 334, 64 S.Ct. 146, 151, 88 L.Ed. 76. Defendant and intervenor contend that for a court to determine that section 6 notice and bargaining is necessary in the instant case would be to determine "the point where the authority of one craft ends and the other begins or of the zones where they have joint authority." *Id.* But, as the Court held in the *General Committee* case, the resolution of the question of "the respective domains for two or more overlapping crafts" is not a matter for the courts, but is instead within the exclusive competence of the National Mediation Board. *Id.* at 335–338, 64 S.Ct. 146, *See also* General Committee of Adjustment, etc. v. Southern Pac. Co., 1943, 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85; Division No. 14, Order of Railroad Telegraphers v.

Leighty, 4 Cir. 1962, 298 F.2d 17, cert. denied, 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287.

We do not find it necessary, however, to resolve the issues which might arise from characterizing the present dispute as a "major" controversy,[5] for we hold that the present altercation constitutes a "minor" dispute over the interpretation of the 1956 Firemen's Agreement, which does not preclude unilateral action nor require exhaustion of section 6, and which is within the exclusive competence of the National Railroad Adjustment Board to resolve.

While the Firemen alleged that the exclusion of arbitraries in the 1968 Engineers' Agreement constitutes a unilateral change in a rule embodied in their 1956 contract, Southern Pacific contends that it is permitted, under the 1956 Agreement, to initiate such a change. Specifically, the Company argues (1) that at the time the 1956 Agreement was signed, arbitraries were not uniformly included in mileage limitations, and (2) that the 1956 Agreement applied only to the regulation of engineer *extra* boards, the rules governing which were not altered by the 1968 Agreement.

While it has been noted that "the difference, on the one hand, between the interpretation and the application of an existing agreement, and, on the other hand, a change in an original intended basis of agreement is often a question of degree," Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 2 Cir. 1962, 307 F.2d 21, 33, cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978, we think it clear that the present dispute "relates * * * to the meaning or proper application" of the provisions of the 1956 Firemen's Agreement and thus raises a question of contractual construc-

---

5. Compare Brotherhood of Locomotive Firemen & Enginemen v. Seaboard Coast Line R. R. Co., 5 Cir. 1969, 413 F.2d 19, cert. denied, 396 U.S. 963, 90 S.Ct. 432, 24 L.Ed.2d 426; Brotherhood of Locomotive Firemen & Enginemen v. Louisville & N. R.R. Co., 6 Cir. 1968, 400 F.2d 572, cert. denied, 393 U.S. 1050, 89 S.Ct. 689, 21 L.Ed.2d 692; and Division No. 14, Order of Railroad Telegraphers v. Leighty, supra, with Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Board, 1969, 133 U.S.App.D.C. 326, 410 F.2d 1025, cert. denied, 396 U.S. 878, 90 S.Ct. 149, 24 L.Ed.2d 136.

tion which must go to the National Railroad Adjustment Board for resolution. *See* Elgin, J. & E. Ry. Co. v. Burley, *supra*, 325 U.S. at 723, 65 S.Ct. 1282; Order of Ry. Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318; Flight Engineers Intern. Ass'n v. American Airlines, Inc., *supra*. We cannot improve upon the following language of Judge Tuttle in St. Louis, S. F. & T. Ry. v. Railroad Yardmasters of America, 5 Cir. 1964, 328 F.2d 749, 752–753, cert. denied, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748:

"This Court had occasion to deal with this problem in Missouri-Kansas-Texas Railroad Company et al. v. Brotherhood of Locomotive Engineers et al., 5 Cir., 266 F.2d 335. In deciding that the challenged conduct in that case which involved changing the assignments of employees in freight service, changing terminals in that class of service, and abolishing a number of positions, this Court said:

'Without intimating any view as to their validity, we think it clear that the respective *contentions* of the Railroad Companies and of the employees are based upon existing agreements; their *claims* are to rights accrued and not to have new rights created for the future. The dispute is thus a "minor" dispute, the resolution of which is committed to the National Railroad Adjustment Board. Primary jurisdiction of that Board cannot be defeated by the emphasis with which any party asserts that its position is clearly the only rightful one, nor would it be appropriate for this Court to discuss the the relative merits of questions which must be decided by that Board'. 266 F.2d at 340.

"It seems clear that the appellee has fallen into the error of assuming that whenever an issue arises between the carrier and the Union relating to 'rates of pay, rules, or working conditions' then section 6 must be invoked. In its brief the appellee says, 'if, as in the instant case, the court's preliminary interpretation of the contract reveals that the dispute is over a change in "rates of pay, rules, or working conditions," * * * then it is incumbent upon the court to retain jurisdiction, * * *' as for the solution of a 'major' dispute. So, too, the trial court in its carefully considered opinion seems to have concluded that the *effect* of the proposed conduct, even though authorized by contract, was of such major significance that it must be deemed a 'major' dispute. It is clear that in solving the problem presented to it, the trial court actually construed the language of Rule 16(e) [of the relevant collective bargaining agreement] as not authorizing the discontinuance of the yardmaster positions, thus clearly demonstrating that it was rejecting the carrier's *construction* of the contract of employment.

"Unless we are to ignore completely the language of Rule 16(e) which on its face, according to the ordinary understanding of the English language does authorize the abolition of yardmaster positions, we are at a loss to understand how it could be decided that the rights of the Union can be determined without a construction of the employment contract or agreement. We do not, of course, any more than did we in the M-K-T case, supra, attempt to construe the contract. This is to be done by the appropriate tribunal. We do say that a defense based upon the language of Rule 16(e) raises a substantial issue as to the interpretation of the contract. It is not a fictitious or merely colorable issue. Before a tribunal can decide that the terminations at issue were not justified, it must construe the language of Rule 16(e)."

*See also* International Brotherhood of Teamsters, etc. v. Braniff Intern. Airways, Inc., *supra*; Railway Express Agency, Inc v. Brotherhood of Railway, Airline, and Steamship Clerks, *supra*; Aaxico Airlines, Inc. v. Air Lines Pilots

Ass'n, 5 Cir. 1964, 331 F.2d 433, cert. denied, 379 U.S. 933, 85 S.Ct. 333, 13 L. Ed.2d 344; International Ass'n of Machinists v. Eastern Airlines, Inc., 5 Cir. 1963, 320 F.2d 451; Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, *supra.*

■ It is equally plain that the dispute over the inclusion or exclusion of arbitraries raised by the instant complaint can be resolved only by construing the existing 1956 Firemen's Agreement. The controversy relates to rights allegedly accrued in the past—the inclusion of arbitraries—and does not propose to alter rights in the future. Questions at issue in this case, such as custom and practice, contractual language, and parol evidence, are the grist for the decisional mill of the body created by Congress with primary jurisdiction over such matters. And, since the instant dispute involves a second union, and two collective agreements, the National Railroad Adjustment Board has the power and the duty to consider the claims of the Engineers. Transportation-Communications Employees Union v. Union Pacific R. R. Co., 1966, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264.

We therefore hold that the present controversy, rather than encompassing a clear change in the terms of a collective agreement, constitutes a disagreement over the meaning of an existing agreement. The dispute is thus a "minor" dispute, the resolution of which is within the exclusive competence of the Adjustment Board. Pending final arbitration by that Board, the Southern Pacific may act unilaterally upon its interpretation of the 1956 collective agreement. We recognize that to each union and to its every member there are no minor disputes, and that all controversies entail economic issues of transcendent importance, but Congress has laid its restraining arm against judicial refereeing of the issues posed in the instant case. Injunctive relief against the implementation of the 1968 Engineers' Agreement is, therefore, clearly inappropriate, and the judgment of the district court dismissing the Firemen's complaint is accordingly affirmed.

Affirmed.