**INDEPENDENT UNION OF FLIGHT ATTENDANTS, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant.**

**Civ. A. No. 80–2598.**

United States District Court, District of Columbia.

Oct. 29, 1980.

John F. Henning, Henning, Walsh & Ritchie, San Francisco, Cal., for plaintiff.

Eric Rosenfeld, Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

OBERDORFER, District Judge.

### FINDINGS OF FACT

1. Pan Am is a carrier by air within the meaning of Section 201 of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, and is subject to the provisions of the RLA.

2. IUFA is the successor collective bargaining representative of Pan Am's approximately 6,500 employees in the craft or class of flight attendants for purposes of collective bargaining under the RLA, pursuant to a certification issued by the National Mediation Board ("NMB") on October 17, 1977 (Mueller Aff. ¶¶ 1 and 5B).[1]

3. Pam Am and IUFA are the parties to a complete collective bargaining agreement

("Pan Am-IUFA working agreement"), signed April 7, 1979 (Mueller Aff., Ex. B, p. 209). The date stated in the current Pan Am-IUFA working agreement for reopening is May 1, 1981 (Sec. 39, p. 208).

4. Pan Am employs flight attendants at nine different base stations (Kriendler Aff. ¶ 1). Approximately 6,500 flight attendants are assigned to those nine stations. Prior to the merger of National Airlines ("National") into Pan Am on January 19, 1980, National had its single base station at Miami which, since the merger, has operated separately from the Pan Am Miami base station (Kriendler Aff. ¶ 1). This case involves the furloughing of flight attendants formerly employed by Pan Am; it does not involve the furloughing of any former National flight attendants.

5. All of the flight attendants involved in this case were covered by the Pan Am-IUFA working agreement prior to the merger and have been covered by that agreement since the merger. That agreement remains in full force and effect.

6. The Pan Am-IUFA working agreement contains various provisions arguably giving Pan Am the right to furlough flight attendants and close flight attendant base stations. Examples include:

a. Section 9A.1 providing that:

. . . the Company retain[s] the right to determine the geographic location of Flight Attendant base stations, the assignment of flying to base stations, and the grouping of flights into patterns for the purpose of scheduling Flight Attendants.

b. Section 9A.6.a. governing "Allocation of Flight Time" and providing that:

It is specifically understood that the Company shall, after consultation with the Flight Service System Scheduling Committee have the right to:

a. Allocate and reallocate Flight Service flight time among the various Flight

---

1. Martin S. Mueller, Director, Labor Relations, Flight Service for Pan Am, furnished an affidavit in opposition to plaintiff's application for a temporary restraining order, and two supplemental affidavits in opposition to the motion for preliminary injunction. The Mueller averments cited here are not contradicted in plaintiff's filings in support of its motion for preliminary injunction, although plaintiff had an opportunity to respond to that affidavit.

Service bases as they are now or may hereafter exist.

c. Section 21A.2 providing that:

In the event of a reduction in force, or a deactivation of a Flight Service Base, or a consolidation of Flight Attendant base stations, . . . [t]he Company shall pay the reasonable transfer expenses in connection with any transfer resulting from such displacement.

d. Appendix C providing that:

Nothing in the above paragraph shall be construed to require the Company to maintain any existing Flight Attendant base stations or to maintain any specific number of Flight Attendants or Pursers at a particular base station.

Most important, Section 26, the "reopener" provision of the agreement, provides, upon the request of either the Company or the Union for conferences, mediation and arbitration in the event of specified contingencies, including a merger (Sect. 26.D, E and F, pp. 166–168). Section 26 provides that in the event of invocation and utilization of the Section 26 procedures, "the provisions of the then existing agreement shall continue in effect" pending award of a Board of Arbitration under Section 26 (Sect. 26.F.5, p. 168).

7. On July 29, 1980, IUFA initiated the Section 26 procedures in relation to the merger, by a written request for conferences under Section 26.D of the working agreement (Mueller Aff. Ex. G). On September 9, 1980, the parties held their initial conference pursuant to that request (Mueller Aff. Ex. U). It is uncontradicted, except in the most general, non-specific terms, that, as of October 20, 1980, they had held 10 conferences pursuant to that request (Mueller Aff. ¶ 5U).

8. On August 4, 1980, Pan Am, IUFA, and IUFA's "Blue" (former Pan Am) and "Orange" (former National) Divisions signed a stipulation for arbitration before Richard R. Kasher of a dispute concerning the integration of the Pan Am and National seniority lists in a fair and equitable manner, pursuant to Sections 3 and 13 of the Labor Protective Provisions ("LPPs") im-posed by the Civil Aeronautics Board as a condition to its approval of the merger of National into Pan Am (Mueller Ex. H). The Stipulation specified that a final award providing for integration of the Pan Am and National seniority lists should be filed no later than December 31, 1980. Paragraph 5(g) of the Stipulation further provided that "in the event it appears that a furlough may be required before an integrated seniority list has been established by a final Award hereunder", Pan Am would give notice of the furlough, and there would then be hearings before the Arbitrator with respect to the method to be followed in effecting any interim furloughs, and an interim award would be issued establishing the procedures to be followed in making the furlough. (Mueller Aff. Ex. H. p. 6). In the event of interim proceedings and an interim award, the final award could be delayed for thirty days beyond the time specified. (Id.) Paragraph 5(g) was included in the Stipulation on the insistence of Pan Am. The purpose of the Stipulation for an interim award was to provide procedures for implementing a furlough if Pan Am deemed a furlough to be necessary before a final award.

9. IUFA did not participate in this stipulation or the ensuing arbitration as an entity, apparently because the Blue (Pan Am) and Orange (National) employees who did participate were its own members and the entity could not take a position in favor of one element without possible dereliction of its representation duty to the other.

10. On August 15, 1980, pursuant to paragraph 5(g) of the Stipulation of August 4, 1980, Pan Am gave IUFA formal written notice of the furloughing of 1,097 Pan Am flight attendants, including the closing of the Seattle and Washington, D.C. bases, effective November 1, 1980 (Mueller Aff. Ex. I). Hearings pursuant to the notice and Stipulation resulted in an interim award issued September 2, 1980, approving Pan Am's proposal, in the notice and at the hearings, to accomplish the furloughs of the former Pan Am flight attendants pursuant to the separate Pan Am seniority roster and

in accordance with the furlough provisions of the Pan Am-IUFA working agreement (Mueller Aff. Ex. M: Mueller Supp. Aff. ¶ 11).

11. Defendant's affidavit avers that it has furloughed Pan Am flight attendants on four previous occasions:

| | |
|---|---|
| Dec., 1973 | 1,035 flight attendants |
| Oct.–Dec., 1974 | 393 flight attendants |
| April, 1975 | 309 flight attendants |
| Nov.–Dec., 1975 | 120 flight attendants |

It also avers that it has closed flight attendant bases on two previous occasions:

| | |
|---|---|
| 1971 | Chicago base station closed; approximately 100 flight attendants assigned to base at time of closing. |
| 1975 | Boston base station closed; approximately 80 flight attendants assigned to base at time of closing. |

Mueller Aff. ¶ 5A. These averments are not specifically controverted by plaintiff. Nor does plaintiff contend, or offer any evidence, that these earlier furloughs and base closings affected labor peace.

12. Pan Am has been treating with IUFA over the furloughs and base closings since they were noticed on August 15. (Mueller Aff. 5.M). There have been numerous conferences and discussions of the furloughs and base closings between Pan Am and IUFA, within and without the framework of particular contract provisions, resulting in a number of formal and informal agreements to "soften" the furloughs and base closings and to cushion their effect. (Mueller Aff. Ex., N, P and R; Kriendler Aff., Ex. D). Neither IUFA, nor either of its elements (Blue and Orange) attempted to bring into the arbitration changes in the arbitration, furlough and base closing rules in the agreement.

13. Pan Am has provided IUFA with information and data concerning its decision to initiate the base closings and furloughs. This information includes: the information accompanying the August 15 notice to IUFA projecting the furlough and base closings (Mueller Aff., Ex. 1); the information placed in evidence at the three days of hearing before Arbitrator Kasher on August 27, 28 and 29 in the interim

furlough arbitration proceeding (Mueller Supp. Aff. II, ¶ 20); and the information contained in a letter dated October 21, 1980, from Pan Am's Jeffrey R. Kriendler to IUFA's Alice Flynn (Mueller Supp. Aff. II, Ex. 4). Plaintiffs no longer press this claim.

14. Since August 27, 1980, IUFA has submitted numerous contract proposals to change the existing agreement and to acquire new rights as to those rates of compensation, rules, and working conditions that will be affected by Pan Am's proposed base closures and furlough actions (Mueller Aff. ¶ 5Q; Flynn Declaration, Ex. B).

15. On September 15, 1980, the thirtieth day after communication of the furlough, IUFA filed a "union officer" grievance protesting the furloughs and base closings noticed August 15, and requesting as remedy that Pan Am maintain "the status quo" pending the conference on merger issues requested by IUFA.

16. The contract requires hearing and response to a grievance within 15 days unless extended by mutual agreement. The time for response was extended at the request of the union officer who filed the grievance on September 17. On October 16, 1980, 30 days after the grievance was filed, the grievance was heard by Pan Am at "Step One" of the contractual grievance procedure. The union officer who filed the grievance requested and was responsible for the delay of 30 days in the holding of the Step One hearing. On October 17, 1980, the day after the Step One hearing, Pan Am issued its Step One decision denying the grievance. (Nichols Aff. ¶ 1–6).

17. On October 10, 1980, in response to a request by IUFA (Mueller Aff., Ex. 5) the National Mediation Board proffered its services to mediate the dispute between Pan Am and the IUFA concerning the negotiation of rates of compensation, rules and working conditions subject to the reopener provisions of Section 26 of the Pan Am-IUFA agreement.

18. On September 29 and 30, 1980, Pan Am sent contractual furlough letters to the 1,097 flight attendants scheduled to be fur-

loughed pursuant to the provisions of the Pan Am-IUFA agreement and the interim award. (Mueller Aff., Ex. T). Attached to each letter was the contractually required System Displacement Form, to be returned no later than October 10, 1980, by each flight attendant deciding to exercise his or her contractual displacement rights.

19. On October 2, 1980, at what defendant represents, without specific contradiction, to be the sixth of the ten conferences held by the parties to date pursuant to IUFA's July 29, 1980, request for conferences over issues arising from the merger, IUFA submitted a proposal to amend the working agreement to bar base closings without IUFA's consent (Mueller Supp. Aff. ¶¶ 15, 16, and Ex. 3).

20. On October 10, 1980, IUFA commenced this action, and applied for a temporary restraining order (TRO) seeking an order enjoining Pan Am's proposed furlough and base closings and seeking an order compelling Pan Am to provide IUFA with certain information pertaining to Pan Am's decision to take these actions. IUFA requested that its application be set down for hearing in the next week (Transcript of October 10, 1980, p. 3).

21. On October 11 and 14, 1980, and pursuant to the returned System Displacement Forms, Pan Am sent notification to 500 flight attendants (subsequently reduced to 473) that they did not have enough seniority to displace other flight attendants and therefore were being furloughed, and to 320 other flight attendants that they were being transferred to other bases, effective November 1 (Mueller Aff. ¶ 5.cc; Kriendler Aff. ¶ 5). Some 567 other flight attendants entered voluntary furlough-avoidance programs (Kriendler Aff. ¶ 5).

22. On October 14, 1980, the Court received affidavits, documentary evidence and briefs from both sides, and heard oral argument on the plaintiff's application for a temporary restraining order. At the hearing of October 14, IUFA's attorney stated that for purposes of its motion for preliminary injunction, "we are willing to withdraw the [IUFA] affidavits and submit only the [Mueller] exhibits and that should withdraw any contest of fact with regard to those affidavits" (Transcript of October 14, 1980, p. 43).

23. On October 16, the Court issued an order denying the TRO.

24. The injury which will be incurred by flight attendants being voluntarily furloughed and transferred effective November 1, 1980, if the IUFA motion for preliminary injunction is denied, is not irreparable. For those flight attendants being involuntarily furloughed, the injury is lost salary and related fringe benefits. For those being involuntarily transferred, the injury is increased commuting costs. (*See* Crane Aff.; Collins Aff.) In such cases, the working agreement provides severance pay, days free of duty, and other rights and benefits to flight attendants excessed and transferred. The parties' recent agreement provides for minimum cost travel for displaced flight attendants (Mueller Aff. Ex. R). The grievance/arbitration process remains available for these employees to seek to recover any other monetary loss if it is determined that they were furloughed or transferred in violation of their rights. 45 U.S.C. § 157.

25. The injury which Pan Am will incur, if IUFA's motion for preliminary injunction is granted, will be both substantial and irreparable. Pan Am will have substantial increased costs, which it represents, without contradiction (albeit without being subject to discovery and cross-examination), to be in excess of $1.5 million each month, consisting of (A) the payroll and related costs of the 1,040 excess flight attendants for whom there will be no flying after October, and (B) the costs of maintaining the two bases, for which there has been no flying since September (Kriendler Aff. ¶¶ 6–8; Mueller Aff. ¶ 5v). The Court finds the cost to be substantial without being able to find the precise amount of it. The prospect of recovering the losses, once incurred, is problematical at best in view of plaintiff's difficulty in providing security. *See IUFA v. Pan Am*, No. 80–1139 Cir. (SMA) U.S. R.C., S.D. Fla. (1980).

26. Finally, denial of relief here comports with the public interest. There is a strong public interest in labor peace and in justice for employees, which interest is reflected in the Railway Labor Act as made applicable to the airlines industry. There is also a public interest in cost effective operation of regulated public utilities such as airlines. The Court is persuaded that denial of the relief sought by plaintiffs here is quite compatible with the public interest in peaceful, just labor relations and will serve the public interest in cost-effectiveness. *See* Airline Deregulation Act of 1978, 49 U.S.C. § 1301, *et seq.*

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action to declare and enforce rights and duties created by the Railway Act, 45 U.S.C. §§ 152, 156 as made applicable to airlines by 45 U.S.C. § 181, pursuant to 28 U.S.C. §§ 1331, 1337 and 2201.

2. That jurisdiction is not ousted by the Norris-La Guardia Act, 29 U.S.C. § 107.

3. Pan Am's decision to furlough employees and to close bases does not constitute a major labor dispute justifying judicial intervention to enjoin these actions. As the Court tentatively ruled in denying the plaintiff's application for a temporary restraining order, defendant's actions are arguably within the scope of authority granted by the existing agreement between the parties. Pan Am's claim that it has the authority to close bases and furlough flight attendants without being required to first engage in negotiations pursuant to Section 26 of the agreement is not, in the words of the Court of Appeals of this Circuit, "so obviously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures prescribed by § 6 [of the Railway Labor Act] for alteration of existing agreements." *Southern Ry. Co. v. Brotherhood of Locomotive Firemen and Enginemen,* 384 F.2d 323, 327 (D.C. Cir. 1967); *see also International Brotherhood of Elec. Wkrs. v. Washington Term. Co.,* 473 F.2d 1156 (D.C. Cir. 1972), *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973).

As shown in Finding 6, *supra,* the agreement specifically vested the carrier with broad authority to close bases and furlough employees. The record also shows that the carrier has frequently effected substantial furloughs in the past. *See* Finding 11, *supra.* The defendant plausibly argues from the plain language of the agreement and the specific furloughs applying the Agreement in the past that the practice of the past and the existing agreement, together with the stipulation and arbitration so recently conducted on the subject, establish the existing working conditions. Thus, this is not a controversy about an employer's effort to change working conditions unilaterally. Nor does Pan Am's intention to close bases and furlough employees without first conducting Section 26 negotiations clearly constitute a unilateral violation of the agreement. Even if Section 26 negotiations do apply in this situation, as plaintiff urges, that Section does state that "until the award of the Board of Arbitration becomes effective the provisions of the then existing agreement shall continue in effect." Section 26(F)(5). Since the provision of the existing agreement give Pan Am authority to close bases and furlough employees, this language arguably does not require negotiation as a precondition to any furloughs or base closings under the existing agreement. This is, therefore, a controversy about the meaning of the existing agreement with respect to base closings, furloughs and the procedure by which they are implemented.

This situation is thus in sharp contrast to one where "the carrier can point to no provision of the contract giving it the contract right" to act as it seeks to. *See United Industrial Workers of the Seafarers, etc. v. Board of Trustees of the Galveston Wharves,* 351 F.2d 183, 190 (5th Cir. 1965) ("Galveston Wharves"). This case is, moreover, not one as in *Galveston Wharves, supra,* where the carrier has ended the relationship between union and employer in violation of specific contract provisions or has precluded further negotiations. The

contract in this case was not terminated and the relationship between employer and union is preserved. Negotiations between the parties have taken place frequently and steadily since the time Pan Am announced the furloughs and base closings in August. *See* Finding 12, *supra.* Not only have benefits been agreed upon to soften the effect of these moves, but the correlation of seniority between the two professional lines has occurred to a considerable extent, largely because of Pan Am's urgings. These facts suggest that Pan Am has throughout attempted to operate within the framework of the existing agreement.

4. Nor is this a minor dispute cognizable by this Court at this time. A minor dispute within the meaning of the Act is one relating to an interpretation of an existing agreement. Here that dispute relates to the interpretation and operation of agreement provisions authorizing unilateral furloughing and base closing and to the interpretation of the Section 26 reopener clause. Primary jurisdiction to decide the merits of such a dispute resides in the Adjustment Board. *See, e. g., National Brotherhood of Elec. Wkrs. v. Washington Term. Co.,* 473 F.2d 1156, 1171 (D.C.Cir. 1932) *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973). Yet plaintiff conspicuously failed even to attempt to invoke the arbitration procedure before the Adjustment Board to challenge Pan Am's right under the existing agreement to proceed with the base closings and furloughs. Thus, the Court has no jurisdiction to intervene in a minor dispute in this case because plaintiff has not pursued arbitral remedies before the Adjustment Board. *See e. g., Southern Ry. Co. v. Bro. of Loc. Firemen Enginemen,* 384 F.2d 323 (D.C.Cir. 1967).

Even if the Court did have jurisdiction, however, judicial intervention, although within the discretion of the Court, would not be appropriate. Courts may properly stay employer actions during so-called minor disputes where, for example, change in the *status quo* might foreclose any meaningful future relief. *See Brotherhood of Loc. F & E v. Southern Pac. Co.,*

447 F.2d 1127, 1133 n. 4 (5th Cir. 1971). As is shown in Finding 20, plaintiff has failed to show that, if the actions ultimately are contested and set aside, their members will not have a full and adequate remedy to redress their injuries.

Another factor mitigating against judicial intervention is that there is no serious contention that Pan Am failed to act in good faith to pursue negotiations with the Union concerning the furloughs and base closings. Pan Am is therefore not guilty of what might be termed "labor law avoidance." *Cf. Fiberboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964); *Teamsters Local 20 v. NLRB,* 610 F.2d 991 (D.C.Cir. 1979). *Compare Galveston Wharves, supra.* This openness to negotiation stands, moreover, in sharp contrast to the Union's failure to raise its objections to the furloughs in timely fashion or to invoke arbitration remedies readily available to it. *See Hoh v. Pepsico, Inc.,* 491 F.2d 556 (2d Cir. 1974).

5. Nor does plaintiff's October 2, 1980, proposal to amend working conditions to prevent, among other things, base closings without union consent and the involvement of the National Mediation Board make this dispute a major one in which judicial intervention is justified. Section 45 U.S.C. § 156 does provide that where an employee representative gives notice of "an intended change in agreements affecting . . . working conditions" and "the Mediation Board . . . has preferred its services . . . working conditions shall not be altered by the carrier until the controversy has been finally acted upon . . . by the Mediation Board." In other words, it is necessary to maintain the *status quo.* The question here, however, is what is the *status quo?* And which party seeks to change it: the carrier or the employee? The Findings of Fact fully support the conclusion that the *status quo* is the base closing and furlough practice arguably authorized by the existing contract and that the change is that proposed by the employees' representative.

6. This conclusion is thoroughly consistent with the Supreme Court's definition of

status quo for purposes of Section 6 of the Railway Labor Act as:

those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute.

*Detroit & Toledo Shore Line R. Co. v. United Transportation Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). In that case, a major dispute was found to exist because the carrier's proposed actions were in no way contemplated by the existing agreement and because the carrier had never taken such actions in the past. In this case, by contrast, the Pan Am-IUFA agreement specifically refers to Pan Am's rights to decide to close bases and furlough employees without mention of first engaging in collective bargaining, and thus arguably grants the company the right to so proceed. Moreover, the numerous substantial furloughs of flight attendants in the past also suggest that such furloughs are included in the *status quo* agreement between the parties, *see* Findings of Fact ¶ 11. The Findings of Fact thus fully support the conclusion that the *status quo* is the base closing and furlough practice arguably authorized by the existing contract and that the change is that proposed by the employee's representative. The dispute does not become one about a carrier change in working conditions simply because the employees take the occasion to demand a right, pursuant to § 26, to bargain about changes in the agreement.

7. Plaintiff's motion for an order compelling Pan Am to "treat" with IUF and to provide information pertaining to its decision to furlough employees and close bases must also be denied. The Supreme Court has held that a court has the discretion to issue an injunction to this effect, whether the central controversy is major or minor. *Virginian Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *see also Southern Ry. v. Brotherhood of Locomotive Firemen and Enginemen*, 384 F.2d 323, 328–29 (D.C.Cir. 1967). The Supreme Court defined "treating" as "enter[ing] into a negotiation for the settlement of labor disputes . . . ." *Virginian Ry.*

*Co. v. System Federation No. 40, supra*, 300 U.S. at 548, 57 S.Ct. at 599. It is, however, evident from the Findings of Fact ¶¶ 12 and 13 that Pan Am has been negotiating with IUFA regarding the impact of the furloughs and closings and has also provided information regarding these actions. In light of these facts, the court finds intervention at this time to be unnecessary.

8. In view of the foregoing, plaintiff has not satisfied the standards enunciated in *Virginia Petroleum Jobbers Assn. v. Federal Power Comm'n.*, 259 F.2d 921, 925 (D.C. Cir. 1958) for granting a preliminary injunction. First, plaintiff has not made a strong showing of likelihood of success on the merits before this Court or before the System Board. *Hoh v. Pepsico, Inc.*, 491 F.2d 556 (2d Cir. 1974). As discussed above, *supra* p. 1018, plaintiff has not made a strong showing that defendant lacks the authority to close bases and furlough employees without first engaging in Section 26 negotiations. Second, plaintiff has failed to demonstrate that, absent judicial intervention, it will be irreparably injured. The injuries it has alleged in its memoranda and accompanying affidavits are extra commuting expenses or salary loss which could be remedied by compensation in the future. *See* Finding 20, at p. 24, *supra*. The inconvenience confronting individual employees could have been anticipated from the agreement provisions and the itinerant nature of flight attendant service. Third, the issuance of an injunction in this case would substantially harm Pan Am, since it would impose large extra operating costs on the company which might be difficult or impossible to recover. Plaintiff's difficulty about posting bond, *see* Finding 25, *supra*, increases the possibility that, if an injunction were issued and later set aside, the harm to Pan Am would be irreparable. Finally, the public interest, as earlier discussed, on the whole weighs in favor of denying equitable relief. *See* Finding 26, *supra*.