John **HOH**, as President of Brewery Workers Local 3, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; and Neil Borra as President of Brewery Delivery Employees Local 46, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Appellants,

v.

**PEPSICO, INC.** and its wholly-owned subsidiaries Rheingold Corporation and Rheingold Breweries, Inc., Appellees.

No. 870 Docket 74-1151.

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1974.

Decided Feb. 8, 1974.

I. Philip Sipser, New York City (Sipser, Weinstock, Harper & Dorn, New York City, of counsel), for appellants.

Herbert Prashker, New York City (Poletti Freidin Prashker Feldman & Gartner, and Robert Morris, Kim Ebb, Lawrence A. Katz, Roger Briton, New York City, Madeline Nesse, Edward Brill, and Kathryn J. Rodgers, New York City, of counsel), for appellees.

Before FRIENDLY, FEINBERG and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

 This appeal, which we heard on an emergency basis, concerns the shutdown of the Rheingold Brewery in Brooklyn, N.Y. The action was begun on January 31, 1974 by petitioners (hereafter the unions) against Pepsico, Inc., Rheingold Corporation, and Rheingold Breweries, Inc. (hereafter the employer) [1] in a New York State court and was removed by the respondents to the District Court for the Eastern District of New York on the basis that the complaints, styled as a petition to compel arbitration under a collective bargaining agreement, stated a claim under § 301 of the Labor Management Relations Act.[2]

---

1. Rheingold Corporation was merged into Pepsico, Inc. on December 31, 1973. Rheingold Breweries, Inc., the owner and operator of the brewery and the signatory of the collective bargaining agreement, was a wholly-owned subsidiary of Rheingold Corporation and, by virtue of the merger, is now such a subsidiary of Pepsico.

2. The unions challenge the propriety of the removal because of a provision in the clause

The collective bargaining contract, which, as renewed on April 30, 1973, runs until May 31, 1976, contains a broad provision that all complaints or disputes which cannot be settled by agreement shall be referred to an Adjustment Committee and, in the event of its inability to reach a decision by majority vote, to arbitration by a three-man board, one member of which shall be a member of the Brewers Board of Trade, Inc., another a member of the unions, and a third to be selected by them or, failing that, to be appointed through the procedures of the American Arbitration Association. The agreement also contains a provision, Part VI, Section 1(B) and (C), for much faster arbitration. If the Adjustment Committee fails to reach a decision within 36 hours after written notice of a request for adjustment and a party desires to proceed more speedily, or if a party alleges a violation of the contract clause prohibiting strikes, stoppages and lockouts, it can demand one-man arbitration by the American Arbitration Association, with the arbitration to begin within 24 hours after notice and with the award to be issued not later than 48 hours after conclusion of the hearing.[3]

In FTC v. PepsiCo, Inc., 477 F.2d 24, 29, 30 (2 Cir. 1973), denying a preliminary injunction against Pepsico's acquisition of control of Rheingold Corporation, we noted that Rheingold's share in the beer market was declining, that it projected a loss of between $2 million and $7 million in its 1973 beer opera-tions, that it had developed no final budget for these, and that "PepsiCo very probably has no interest in the beer business." As early as mid-December, 1973, Pepsico and its labor counsel alerted the unions as to the probability of an early shutdown of the Rheingold brewery; on January 2, 1974, the unions were told it would have to close by the end of the month except in the unlikely event that a purchaser could be found. Five days later, on January 7, 1974, the employer notified the employees that for the economic reasons of which the unions had already been apprised, it had decided to suspend new brewing operations but that this would not significantly affect the employment level for the rest of the month, since the last brewing cycle commenced on January 4, 1974 would require another three and a half weeks. On January 25, the employer notified the employees that, in view of the large losses being incurred and the failure of its two-year search for a purchaser who could operate the brewery under conditions satisfactory to the unions,[4] all operations would cease on February 1 and all employees (other than those needed for clean-up work) would then be terminated—unless before that date a suitable purchaser could be found.

The unions responded by serving, on January 28, a copy of twelve Issues for Submission to the Adjustment Committee. Several of these related to the alleged impropriety of the February 1 termination. The claim of impropriety was

relating to quick arbitration, hereafter discussed, which reads as follows:

> The award of the Arbitrator may be enforced in the courts of the State of New York. It is expressly agreed that neither the employer nor the union or any employee will seek removal of any such proceeding in the courts of the State of New York to the Federal Courts and they expressly waive their right to seek such removal.

But the petition here was to compel submission to arbitration, not to enforce an arbitration award. Moreover, even as to the latter, the clause against removal was limited to awards obtained by the quick arbitra-tion procedure which, as will later appear, the plaintiffs have not invoked. Plaintiffs' offer to submit parol evidence that the clause, drawn by experienced counsel, was intended to have a broader scope than its plain language was rightly rejected by the district judge.

3. The agreement designates five arbitrators any one of whom would be acceptable. If none should be available, the Association is to make the appointment.

4. The papers indicate that the employer was willing to make the sale for a nominal consideration.

based on two theories—"the representations made by it [the employer] to its employees and the Union concerning the continuance of its operations and/or its failure to disclose critical information concerning such continuance, at the time of the execution of the current collective bargaining agreement," and an obligation to continue operations until the contract's expiration date in 1976. Attempted resolution by the Adjustment Committee proved abortive and on January 30, the unions sent the American Arbitration Association a request for arbitration of the twelve issues. The request did not refer to the quick arbitration procedure of Part VI, Section 1(B) and (C), and the Association's response of January 31, enclosing a list of names from which the arbitrator would be appointed and requesting a return of the list not later than seven days thereafter, must have made it clear to the unions that the Association did not so understand it.

On the same day, without having received any indication from the employer that it would decline to submit to arbitration,[5] the unions filed in the state courts the petition to compel arbitration to which we have already referred. The petition alleged that the unions had requested deferral of the shutdown pending the determination of the arbitration but that the employer had declined. Accordingly, the unions sought injunctive relief to that end.

After the removal the application came on before Judge Bartels on February 1, at the close of business on which the plant was to shut down. There was some debate whether the application should be regarded as one for a temporary restraining order, F.R.Civ.P. 65(b), or for a preliminary injunction, F.R.

Civ.P. 65(a). Both sides seemed to prefer that the judge include consideration of the latter in order that his decision might result in an order appealable under 28 U.S.C. § 1292(a)(1). In the course of the presentation, counsel for the unions made some suggestion that the unions might be satisfied with an injunction requiring preservation of the plant in shape for future operation or sale and wage payments of not more than $100,000 per week, without a resumption of production. After reviewing such papers as were before him and a number of decisions, the judge concluded "that the petitioners have failed to make a clear showing of probable success on the merits which would justify the issuance of a temporary restraining order or, without a hearing, a preliminary injunction." Accordingly he denied the application, although granting a stay of the shutdown until midnight on February 4.[6] He relied particularly on Part VII(B) of the collective bargaining agreement which read in relevant part:

> (B) In the event that the Employer shall suspend or discontinue the operations of its plants in whole or in part, its obligations hereunder shall be correspondingly suspended or discontinued.

The unions appealed to this court and asked for a hearing on February 4. At that time the parties stipulated that until midnight on February 8, unless this court should determine the appeal earlier, the employer would conduct clean-up operations as previously planned and announced, keep on hand sufficient saleable beer to fill a million cases, and not dismantle the plant or sell it except to a person who would continue brewery operations.[7] We agreed to hear

---

5. The employer has now agreed to arbitration. The unions regard this as unsatisfactory because no similar agreement has been made by the parent. The liability, if any, of the parent to join in the arbitration and to honor an arbitration award clearly is not susceptible of summary determination.

6. This was conditioned on the unions' filing a bond of $100,000 against damage to the plant; this was never filed.

7. The stipulation did not bar earlier termination of employment, and we are advised that this has occurred except for employees engaged in the clean-up work. On February 4 the employer paid the employees their "banked" vacation pay.

the appeal on February 6. Since denial of a temporary restraining order is not appealable, Grant v. United States, 282 F.2d 165, 167 (2 Cir. 1960), save in the rare case, not here presented, where despite the label the effect is that of denial of a preliminary injunction, see C. Wright, Federal Courts 459 (2d ed. 1970), the sole question before us is whether the judge abused his discretion in refusing to issue a preliminary injunction.

■ Somewhat ironically, the unions attack the denial of a preliminary injunction on the ground that in the few hours which were all that he had available, the judge did not conduct an evidentiary hearing or make findings of fact and conclusions of law, F.R.Civ.P. 52(a) and 65(b). It would be a sufficient answer that if the judge should not have denied a temporary injunction under such circumstances, he still more clearly should not have granted one as the unions want, and the parties asked him to do one or the other. The judge made clear that a principal ground for his denial was that there had been no opportunity for a hearing; nothing prevented the unions' seeking one on February 4 or later. While this alone might suffice to dispose of the appeal, we think it preferable, in light of the human problems involved, to go into the matter somewhat more extensively.

■■ Citing Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union, 471 F.2d 872 (6 Cir. 1972), cert. denied, 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973), and Emery Air Freight Corp. v. Local Union 295, 449 F.2d 586, 588–589 (2 Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), the employer asserts that, despite Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S.

235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, as distinguished from § 4, 29 U.S.C. § 104, remains applicable when an injunction is sought in a labor dispute, even in aid of arbitration. Perhaps this goes somewhat too far. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 458–459, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957). We prefer Judge Gibbons' formulation in United States Steel Corp. v. United Mine Workers, 456 F.2d 483, 487 (3 Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972), that § 7 remains applicable so far as consistent with the policies of § 301 of the Labor Management Relations Act as interpreted in the dissenting opinion in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215, 228–229, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), which the Court approved in Boys Markets, supra, 398 U.S. at 249–253, 90 S.Ct. 1583. We see no inconsistency with § 301 in such provisions of § 7 as those which prohibit the issuance of an injunction except after hearing the testimony of witnesses in open court and demand a finding, on the basis of such testimony, that "as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief." Perhaps, despite this, a court might issue an injunction against an employer without taking testimony if on the undisputed facts the balance tipped decisively in favor of the unions and the other criteria governing the issuance of injunctions were met. This was not the case here. If the unions should prevail in the arbitration, their members would receive substantial monetary relief. On the other hand, if they should lose, the employer would be without remedy for its losses, even on the unions' modified request, unless they were to post a large bond.[8] Time pres-

---

8. The possibility of this seems remote in light of the unions' failure to post a $100,000 bond, on much more limited conditions, which the judge required as a condition to postponing the shutdown until midnight February 4. Counsel candidly stated

sures on the district court which the unions could readily have avoided by earlier invocation of arbitration or by insisting on the quick arbitration procedure afford no basis for dispensing with the testimony on disputed issues required by § 7 of the Norris-LaGuardia Act and by F.R.Civ.P. 65.

■ Furthermore, the "ordinary principles of equity" referred to as a guide in the portion of the *Sinclair* dissent that was approved in *Boys Markets* include some likelihood of success. At least this much is required by Judge Frank's liberal formulation in Hamilton Watch Co. v. Benrus Watch Co., 206 F. 2d 738, 740 (2 Cir. 1953). We think this must mean not simply some likelihood of success in compelling arbitration but in obtaining the award in aid of which the injunction is sought. Although courts have been directed by the *Steelworkers'* Trilogy, 363 U.S. 564, 574, 593, 80 S.Ct. 1343, 1347, 1358, 4 L.Ed.2d 1403, 1409, 1424 (1960), to be liberal in construing agreements to arbitrate, this instruction does not extend to the grant of ancillary relief; on such a matter they must continue to exercise the sound discretion of the chancellor. It would be inequitable in the last degree to grant an injunction pending arbitration which was costly to a defendant on the basis of a claim which although arguably arbitrable was plainly without merit.

■ We see little reason to think the unions here have met the requirement of showing some likelihood of ultimate success. To be sure, the unions allege, although with notable lack of specificity, the employer induced them to agree to the last extension of the agreement by unduly optimistic predictions and concealments. Even putting to one side the question whether parol evidence could override Part VII(B) of the collective bargaining agreement, quoted above, no evidence on all this was produced. The unions also refer to Part VI, Section 2, which provides in pertinent part:

> (A) Neither while a controversy is under submission as hereinabove provided, nor during the pendency of an arbitration, nor following one, nor while this contract shall be in force and neither party has been determined to be in violation of any of the provisions hereof shall there be resort to a strike of any kind, shop strike, sitdown strike, slowdown, sympathetic strike, walkout or lockout against any of the parties to this agreement.

But this section must be read along with the clause permitting the employer to suspend or discontinue and in light of the general unlikelihood of an employer's committing himself to a union to remain in business for a fixed term whatever the losses might be. The Supreme Court has recognized, in the context of determining unfair labor practices under § 8 of the National Labor Relations Act, the difference between "a complete liquidation of a business" and a lockout used as a temporary economic weapon in a labor dispute, just as, on the other side, there is a difference between a permanent quitting of employment and a strike. Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 271–272, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).[9]

■ Beyond all this, and most significantly, the unions' case was lacking in

that he could afford no assurance that the unions could post a bond adequate to protect the employer against losses if the arbitrator should rule against the unions.

9. An expedited arbitration of similar "nolockout" clauses in the employer's collective

bargaining agreements with four other unions produced an award on February 3, 1974 that the permanent closing of the brewery did not violate the clauses.

equity because of their failure effectively to invoke arbitration remedies readily available to them. Insofar as they are relying on the anti-lockout clause, they could already have had a quick arbitration under Part VI, Section 1(B)(2) even if they had done nothing until January 25. But the issue of shutdown had been posed long before that. Nothing prevented the unions from submitting the issue of the employer's right to close to the Adjustment Committee in mid-January, affording ample time for such an arbitration under the broader provision of Part VI, Section 1(B)(1). We fail to perceive what equitable principle would justify a court in giving these unions, by way of preliminary injunction, a remedy they could have had by arbitration if their position was justified, but which they chose not to seek until two days before the date set for the shutdown and then not by the expedited procedure to which the parties had agreed.

Like the district judge, we are not insensitive to the desire of Rheingold's employees to continue with work to which many have devoted their lives, although the employer says, a position on which we do not pass at all, that the plight of the employees may be a consequence of unions' pressing demands so high as to destroy their members' future. It suffices that we are bound by the principles of equity, as was the district judge. When we combine the unions' delay in pursuing their arbitral remedies, the lack of any testimony before the judge, and the unions' failure to show that the balance of hardship tips in their favor, we cannot find that he abused his discretion in denying a preliminary injunction. Indeed, he had no alternative.[10]

Affirmed.

10. The district judge did not have before him a proposal for an injunction as limited as the stipulation approved by this court on February 4. In light of reports in the press that negotiations for sale of the brewery are continuing and the concession of counsel for appellees that compliance with this stipula-

tion does not involve significant expense, we think it would be constructive if appellees were to continue to comply with the stipulation, so long as viable negotiations are in progress, until midnight on February 15, 1974.