**Carl J. KINTSCHE, Plaintiff,**

v.

**Emory WOODARD, Jr. and United Steel Workers of America, Defendants.**

**Civ. A. No. 84–5030.**

United States District Court, E.D. Pennsylvania.

Nov. 20, 1985.

Dennis Woody, Media, Pa., for plaintiff.

Marc S. Jacobs, Gelfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., for defendants.

**FINDINGS OF FACT and CONCLUSIONS OF LAW**

SHAPIRO, District Judge.

This is an action brought by a union member against an international union and an officer of that union for wages lost

because the union failed to protect the alleged superseniority rights of the plaintiff during a layoff. The case was tried to the court and the following constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

## I. FINDINGS OF FACT

Plaintiff Carl J. Kintsche is a citizen of the Commonwealth of Pennsylvania. Mr. Kintsche has been employed by the Lansdowne Steel & Iron Company ("Lansdowne") since February 9, 1979. The plant at which Mr. Kintsche has been employed is located in Morton, Pennsylvania.

Defendant United Steelworkers of America (the "Union") is an international union. The Union is the certified representative of the workers at the Lansdowne facility in Morton. Mr. Kintsche has been a member of the Union throughout his employment by Lansdowne.

Defendant Emory Woodard, Jr. was the representative of the international Union to the local Union during all relevant periods. He also was and remains a Subdistrict Director of the international Union for the region including the Lansdowne plant.

A collective bargaining agreement with Lansdowne negotiated by the Union and ratified by the workers was signed on June 5, 1980 (the "collective bargaining agreement"). At all relevant times the collective bargaining agreement was in force between Lansdowne and the Union. (The collective bargaining agreement was attached to the pretrial order filed in this case.)

Under the collective bargaining agreement, seniority was defined as "the length of an employee's service with the company and it shall apply plantwide." Collective Bargaining Agreement, Article VIII, § 34 (June 5, 1980).

The collective bargaining agreement further provided:

a) For purposes of lay off only, the President, Vice President, Recording Secretary, Financial secretary and Treasurer of Local Union and up to six (6) Shop Stewards shall be considered as having top seniority during their term of office, provided, however, they are currently able to perform the work required on the jobs available. The Union will promptly and from time to time notify the Company of the names of such employees who are to receive such seniority preference.

b) The President of the Local Union shall have preference for day shift assignment during his term of office.

c) In the event appropriate Federal Law or Orders of any Federal Commission or Authority require a revision of the seniority provisions of this Article, such Law or Order shall govern.

Collective Bargaining Agreement, Article VIII, § 43 (June 5, 1980). This provision was not amended during any period relevant to this case.

During all layoffs after the effective date of the collective bargaining agreement until the events of which plaintiff complains no shop steward on the Grievance Committee of the Union was ever denied the benefit of the "superseniority" afforded by the collective bargaining agreement.

When the collective bargaining agreement was negotiated, the employees of Lansdowne worked in three shifts. Two shop stewards were elected for and served on each shift. In April, 1982, Mr. Kintsche was elected by members of the local Union to be a shop steward on the day shift and serve on the Grievance Committee. At the time of the election, members of the local Union were told that shop stewards enjoyed superseniority. The parties agree that from his election until January 4, 1984, Mr. Kintsche at all times enjoyed superseniority.

On February 18, 1982, Bernard Klieman, General Counsel of the international Union, issued a memorandum entitled "SUPERSENIORITY FOR LOCAL UNION OFFICERS" to all district directors and department heads of the Union in the United States. (Ex. D–1). This memorandum discusses, *inter alia*, the decisions of the National Labor Relations Board ("NLRB") in *American Can Co.*, 244 NLRB 736, 102

LRRM 1071 (1979); *Otis Elevator Co.*, 231 NLRB 1128, 96 LRRM 1108 (1977); and *Dairylea Cooperative, Inc.*, 219 NLRB 656, 89 LRRM 1737 (1975), *enforced sub nom. NLRB v. Milk Drivers & Dairy Employees, Local 338*, 531 F.2d 1162, (2d Cir. 1976). The memorandum states, "we have taken the position ... that superseniority is proper for the top five officers of the local union and the grievance committee members or stewards." However, the memorandum acknowledges that the rulings in *American Can Co.* and *Otis Elevator Co.* suggest limits on the number of "union officials" who may be given superseniority and that "the policy outlined above may well have to be adjusted in plant closing where the number of employees has been drastically reduced or where the number of *officers* retained on the basis of superseniority is large compared to the non-officer employee complement." (Emphasis added).

On March 5, 1983, Mr. Klieman issued a memorandum entitled "Superseniority for Local Union Officers in Light of *Gulton Electro-Voice*" to all district directors and department heads of the Union in the United States. (Ex. P–A). This memorandum discussed *Gulton Electro-Voice, Inc.*, 266 NLRB 406, 112 LRRM 1361 (1983). This memorandum informed union personnel that union *officers* not involved in processing grievances or on-the-job contract administration would no longer have superseniority. The memorandum also stated:

> In light of *Gulton Electro-Voice*, we have taken the position that as a rule superseniority for Presidents and Vice Presidents as well as grievance committee members can probably be sustained under the new Board law on the grounds that they do perform representation duties on the job.

The local Union informed its Recording Secretary, Financial Secretary and Treasurer that they no longer had superseniority. These three officers acquiesced in this decision.

When the Union and Lansdowne entered into the collective bargaining agreement in 1980, Lansdowne was employing at Morton approximately 200 to 270 workers working in three shifts. The size of the work force fluctuated in subsequent years. In October, 1983, the work force was approximately 50 workers working in three shifts: there were five shop stewards. In October, 1983, some Union members began complaining that too many Union functionaries had superseniority in proportion to the number of workers still on the job. These complaints continued through December, 1983.

Meetings were held between the management of Lansdowne and the Union on October 1, and November 1, 1983, regarding reduction of the workforce. The November 1, 1983 meeting was attended by the President and Vice-President of Lansdowne and by representatives of both the local and international Union, one of which was Emory Woodard, Jr. During the November 1, 1983 meeting the subject of superseniority for shop stewards was considered. The Lansdowne officers asked Mr. Woodard to investigate the legal implications of the NLRB's ruling in *American Can Co.*

The minutes of the November 1, 1983 meeting (Ex. D–2), which were prepared by John P. Hilferty, Jr., the President of Lansdowne, stated in part:

THE UNION BROUGHT THE FOLLOWING ITEMS UP FOR DISCUSSION AT THIS SPECIAL MEETING:

1. SUPERSENIORITY—THE UNION GAVE THE COMPANY THE FOLLOWING GUIDELINE FOR ADMINISTRATION OF SUPERSENIORITY DURING TIME OF REDUCED EMPLOYMENT:

   A. THE PRESIDENT AND VICE–PRESIDENT WOULD REMAIN AS A RESULT OF THE U.S.W.A. INTERPRETATION OF A RECENT NLRB DECISION.

   B. THE LEAST SENIOR OF THE FIVE SHOP STEWARDS WOULD BE LAID OFF, BECAUSE OF THE CURRENT TWO SHIFT PRODUCTION SCHEDULE. THE CURRENT CONTRACT REFERS TO UP TO SIX SHOP STEWARDS. THE INTENT

OF THAT CLAUSE WAS FOR COVERAGE DURING A THREE SHIFT PRODUCTION SCHEDULE, WITH TWO SHOP STEWARDS PER SHIFT; THEREFORE, WHEN THE COMPANY IS RUNNING TWO SHIFTS, A TOTAL OF FOUR SHOP STEWARDS ARE ENTITLED TO SUPERSENIORITY.

This "guideline" was proposed by Mr. Woodard. Whether the "guideline" as intended as a proposal or an agreement, the officers of Lansdowne adopted it as a guideline to be followed during layoffs. This "guideline" was not made known to other members of the Union.

Some time between November, 1983, and January 4, 1984, shop steward David Duffy was laid off for reasons of absence. This did not violate the superseniority provisions of the collective bargaining agreement.

At the local Union monthly meeting in early December, 1983, some members complained that too many Union functionaries had superseniority. Liz Clark of the international Union, attending on behalf of Mr. Woodard, addressed the issue.

Sometime in December, 1983, either before or after the local Union meeting, Mr. Woodard called Walter Kurkowski, Assistant Director for international Union District 7, and discussed with him the "rumblings" against superseniority. Mr. Kurkowski, who is not a lawyer, confirmed Mr. Woodard's understanding of the law. In late December, 1983 or early January, 1984, Mr. Kurkowski called Richard J. Brean, Assistant General Counsel of the international Union to discuss the law and Union policy on superseniority. Mr. Brean, who had experience in this legal area and had participated in the Union's unsuccessful defense in *American Can Co.*, conveyed his understanding of the law to Mr. Kurkowski.

Sometime in December, 1983 or January, 1984, *before* Mr. Kintsche was laid off, Mr. Woodard told Lawrence Yocum that the Union was required to reduce the number of Union functionaries with superseniority when disproportionate to the number of Union members working.

On January 4, 1984, another Lansdowne layoff resulted in 27 workers remaining on the job, all on one day shift. Mr. Kintsche was among those laid off. Four workers with superseniority were retained: Lawrence Yocum, Neil Orr (local Union Vice-President), Daniel Fetch (a shop steward) and Kevin Campbell, all of whom had more regular plant seniority than Mr. Kintsche. Mr. Fetch and Mr. Campbell had previously served as stewards on a different shift. (The Local Union President, Vice-President and the two shop stewards subsequently proved completely adequate to represent the workers who remained on the job.) Another shop steward, Gary Stevenson, who had greater regular plant seniority than Mr. Kintsche, was also laid off on January 4, 1984. The 23 other employees retained on the job also had more regular plant seniority than Mr. Kintsche.

On January 4, 1984, plaintiff filed a written grievance challenging his layoff. The grievance was signed by Mr. Kintsche, Gary Stevenson and David Duffy. The grievance was presented to Kevin Campbell, shop steward and Chairman of the Grievance Committee.

Mr. Kintsche's grievance did not proceed through the first two steps of the grievance procedure. Collective Bargaining Agreement, Article VI, § 23 (June 5, 1980). However, a "third step" meeting was held approximately two weeks after the January 4, 1984 layoff. The meeting was attended by Mr. Kintsche and the four other shop stewards, Kevin Campbell, David Duffy, Daniel Fetch and Gary Stevenson, as well as Lawrence Yocum, Emory Woodard, Jr., John Hilferty, Jr. and Nick Hawley, Jr. At the meeting, the Lansdowne officers deferred to the Union and Mr. Woodard agreed to seek further legal advice. Plaintiff's grievance was not resolved.

After the "third step" meeting, Mr. Kintsche had numerous telephone conversations and meetings concerning his grievance with Mr. Woodard. However, Mr. Kintsche's grievance was not resolved.

Under the collective bargaining agreement if a dispute was not satisfactorily settled in "step three" the Union had thirty (30) calendar days after receiving Lansdowne's written response in step three to submit the dispute to arbitration. There was no such written response, and the Union never submitted Mr. Kintsche's grievance to arbitration.

On February 5, 1984, plaintiff was recalled to work but this was not based on resolution of his grievance. Therefore, the amount in controversy is Mr. Kintsche's lost wages from January 4, 1984 to February 4, 1984, a total of $1,931.41.

On April 2, 1984, a meeting was held regarding the lay off of shop stewards at the international Union office in King of Prussia, Pennsylvania. The meeting as attended by Carl Kintsche, Kevin Campbell, David Duffy, Gary Stevenson, Neil Orr, Walter Kurkowski, and John Portello. Mr. Woodard and Mr. Kurkowski gave two reasons for layoff of the shop stewards: 1) it would be unfair to retain the shop stewards and lay off workers with much greater regular plant seniority; and, 2) rulings of the NLRB required that the proportion of Union functionaries with superseniority to the number of employees working be "reasonable." They circulated a copy of the Klieman memorandum of February 18, 1982. (Ex. D-1). Mr. Kurkowski also stated his opinion that if the Union sought arbitration of the shop stewards' grievances, the Union would lose.

Mr. Woodard, Mr. Kurkowski and Mr. Brean feared that the Union could face unfair labor practice charges under 29 U.S.C. § 158(b)(2), 28 U.S.C.A. § 158 (1947) if a disproportionate number of union functionaries had superseniority in times of reduced employment.

On July 19, 1984, plaintiff filed a complaint against the Union and Mr. Woodard in the Pennsylvania District Court of Delaware County. A default judgment was entered for plaintiff for $1,931.41 including costs. Defendants filed a timely appeal to the Pennsylvania Court of Common Pleas of Delaware County. On September 18, 1984, plaintiff filed this complaint in the Court of Common Pleas, Civil Action No. 84–10903, and the defendants then removed the action to this court pursuant to 28 U.S.C. § 1441 (1948).

On November 29, 1984, Lansdowne and the Union entered into a new agreement regarding superseniority of Grievance Committee members.

## II. DISCUSSION

The issue is whether defendant Emory Woodard, Jr., a union official, and the defendant Union, have breached their "duty of fair representation" to plaintiff Carl J. Kintsche, a union member.

Section 9(a) of the National Labor Relations Act ("NLRA") provides that the union "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representative of all the employees in such unit for the purposes of collective bargaining...." 29 U.S.C. § 159(a) (1935). Because a union so selected is the exclusive representative of all employees in a bargaining unit, the union bears a concomitant duty to represent the interests of each and every employee in that unit fairly. *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n. 22, 104 S.Ct. 1844, 1851 n. 22, 80 L.Ed.2d 366, 376 n. 22 (1984); *DelCostello v. Int'l. Brotherhood of Teamsters*, 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n. 14, 76 L.Ed.2d 476, 489 n. 14 (1983); *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Wallace Corp. v. NLRB*, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944); *Sisco v. Consolidated Rail Corp.*, 732 F.2d 1188, 1191–92 (3d Cir.1984) (discussing the NLRA).

The union's duty of fair representation extends not only to collective bargaining but also to administering the collective bargaining agreement and representing employees in grievance and arbitration procedures provided by the agreement. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976);

*Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Conley v. Gibson,* 355 U.S. 41, 78. S.Ct. 99, 2 L.Ed.2d 80 (1957); *Starks v. Perloff Brothers, Inc.,* 760 F.2d 52 (3d Cir.1985).

An employee who alleges that a union owing him or her the duty of fair representation has breached that duty with regard to a contractual right may file suit against the union in state court or in federal court under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1947). *Humphrey,* 375 U.S. at 343–44, 84 S.Ct. at 368–69, 11 L.Ed.2d at 378–79; *Starks,* 760 F.2d at 54–55.

Plaintiff alleges that he was laid off at the instigation of the defendants in violation of his superseniority rights under the collective bargaining agreement and that the defendants failed to represent him fairly and adequately in processing his grievance challenging his layoff. Therefore the court has jurisdiction over plaintiff's claim under 29 U.S.C § 185 (1947) and the case was properly removed from state court under 28 U.S.C. § 1441 (1948).

■ Plaintiff's suit is not barred by failure to exhaust contractual or internal union remedies. His grievance reached the third step of the grievance procedure provided under the Collective Bargaining Agreement, Article VI, § 23 (June 5, 1980). The step three meeting was held approximately two weeks after plaintiff was laid off. Although the collective bargaining agreement required Lansdowne to give a written answer within ten working days of the step three meeting, *id.,* the company did not do so. Under the contract, within thirty (30) calendar days of receiving the company's written response in step three, *the Union* may initiate binding arbitration. *Id.* Since plaintiff could neither force Lansdowne to give him a written response to his grievance nor initiate arbitration on his own, he satisfactorily exhausted his contractual remedies. *Cf. Hines,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (where union refuses to or fails adequately to represent employee no further exhaustion of remedies is required). *Accord, DelCostel-*

*lo,* 462 U.S. at 163–64, 103 S.Ct. at 2290, 76 L.Ed.2d at 488; *Vaca,* 386 U.S. at 185–86, 87 S.Ct. at 914–15, 17 L.Ed.2d at 855. Furthermore, no evidence has been presented that there are any internal Union procedures which Mr. Kintsche has failed to exhaust. *Cf. Clayton v. U.A.W.,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981) (discussing when internal union grievance procedures must be exhausted).

■ There is no statute of limitations barrier to plaintiff's suit. The applicable limitations period is six months. *DelCostello,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476. The Union could have sought to have Mr. Kintsche's grievance arbitrated for at least thirty (30) days after the "third step" meeting in the second half of January, 1984, and probably for a considerable period thereafter because of Lansdowne's failure to respond in writing to the third step meeting. *See* Collective Bargaining Agreement, Article VIII, § 23 (June 5, 1980). Therefore, Mr. Kintsche's suit, filed July 19, 1984, was timely filed as this court ruled in denying defendants' motion for summary judgment on March 7, 1985. *See Taylor v. Ford Motor Co.,* 761 F.2d 931 (3d Cir.1985) (where employee seeks to enforce arbitration award, breach of duty of fair representation claim does not accrue until union unequivocally refuses to assist employee, or, if no such refusal, when statute of limitations on union's action against employer has run).

■ Most duty of fair representation suits brought in federal court under Section 301 of the LMRA are brought against both the employer and the representative union. *Cf. Bowen v. United States Postal Service,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983) (damages recoverable against union for breach of duty of fair representation are limited). Mr. Kintsche has sued only his Union and one of its officials. However, in a suit brought under 29 U.S.C. § 185 (1947), "[t]o prevail against either the company or the Union, ... (employee-plaintiffs) must not only show that their discharge was contrary to the contract but must also carry the bur-

den of demonstrating breach of duty by the Union...." *DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2290, 76 L.Ed.2d at 489, quoting *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 66–67, 101 S.Ct. 1559, 1565–66, 67 L.Ed.2d 732, 743 (1981) (Stewart, J., concurring in judgment), in turn quoting *Hines*, 424 U.S. at 570–71, 96 S.Ct. at 1059, 47 L.Ed.2d at 245. "The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both." *DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291, 76 L.Ed.2d at 489. This also the law if an employee alleges wrongful layoff instead of a wrongful discharge.

The rationale for the rule is clear. If the employee does not prove a breach of the collective bargaining contract has occurred, then the employee has not suffered any injury of which he or she may complain under 29 U.S.C. § 185 (1948). Alternatively, if the Union has not breached its duty of fair representation, then the employee cannot seek to overturn the resolution of his or her claim by "final and binding" grievance procedures provided by the collective bargaining agreement, regardless of the merits of the grievance, absent highly unusual circumstances. *See W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 764, 766–67, 103 S.Ct. 2177, 2182, 2183–84, 76 L.Ed.2d 298, 306, 307–08 (1983) (courts must enforce arbitrator's decision regardless of merits unless endorsement would be contrary to public policy or the decision did not draw its essence from the collective bargaining agreement); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960).

■ The duty of fair representation is the duty of the union selected to represent the members of a collective bargaining unit "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *DelCostello*, 462 U.S. at 167 n. 14, 103 S.Ct. at 2290 n. 14, 76 L.Ed.2d at 489 n. 14 (1983), quoting *Vaca v.*

*Sipes*, 386 U.S. at 177, 87 S.Ct. at 910, 17 L.Ed.2d at 850. Thus, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. at 190, 87 S.Ct. at 916, 17 L.Ed.2d at 857; *Humphrey*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370; *Starks*, 760 F.2d at 54; *Findlay v. Jones Motor Freight*, 639 F.2d 953, 957 (3d Cir. 1981).

The collective bargaining agreement was negotiated with Lansdowne by the international Union, ratified by the members of the bargaining unit, and signed on June 5, 1980. Lansdowne and the international Union are the contracting parties under the collective bargaining agreement.

In 1980, when the collective bargaining agreement was negotiated, Lansdowne was employing at Morton approximately 200 to 270 workers working in three shifts. The contract provided for superseniority for eleven union functionaries: the local Union President, Vice President, Recording Secretary, Financial Secretary, and Treasurer, and up to six shop stewards. Collective Bargaining Agreement, Article VIII, § 43(a) (June 5, 1980). But the seniority provision was expressly made subject to changes in federal law or administrative order.

On February 18, 1982, Bernard Klieman issued a memorandum to all district directors and department heads of the Union in the United States (Ex. D–1). That memorandum stated that the rulings of the NLRB in *American Can Co.*, 244 NLRB 736, 102 LRRM 1071 (1979) and *Otis Elevator Co.*, 231 NLRB 1128, 96 LRRM 1108 (1977) suggested that the number of "union officials" who had superseniority needed to be reduced when the number of workers actually employed was significantly diminished.

The workers at Lansdowne's Morton plant elected shop stewards by shifts. In April, 1982, there were three shifts in operation. Mr. Kintsche was elected to an open shop steward position in April, 1982, by the

workers on the day shift. At the time of the election the members of the local Union and Mr. Kintsche were told that the shop steward elected would enjoy superseniority.

On March 5, 1983, Mr. Klieman issued a second memorandum to all district directors and department heads of the Union in the United States (Ex. P–A). This memorandum stated that in light of the NLRB's ruling in *Gulton Electro-Voice, Inc.*, 266 NLRB 406, 112 LRRM 1361 (1983) union officers not involved in on-the-job contract administration could no longer have superseniority. (*Gulton Electro-Voice* was enforced *sub nom. Local 900, I.U.E. v. NLRB*, 727 F.2d 1184 (D.C. Cir.1984), and also upheld in *NLRB v. Niagara Machine & Tool Works*, 746 F.2d 143 (2d Cir.1984) and *Local 1384, U.A.W. v. NLRB*, 756 F.2d 482 (7th Cir.1985).) In response to this memorandum, the local Union at Lansdowne informed its Recording Secretary, Financial Secretary, and Treasurer that they could no longer enjoy superseniority. These three officers acquiesced in this decision.

In October, 1983, the Lansdowne Morton work force was approximately 50 workers working in only two shifts. Some union members complained that too many Union functionaries had superseniority relative to the number of workers still on the job. These complaints continued through December, 1983.

Meetings were held between the Management of Lansdowne and the Union on October 1, 1983, and November 1, 1983, regarding reduction of the workforce. During the meeting of November 1, 1983, the participants discussed the implications of the NLRB's ruling in *American Can Co.* for the number of shop stewards who could have superseniority in times of decreased employment. The superseniority "guideline" proposed by Emory Woodard was accepted as a guideline by the management of Lansdowne. The management also asked Mr. Woodard to investigate further the legal implications of *American Can Co.*

Mr. Woodard called Walter Kurkowski to discuss and seek guidance on the superseniority issue in December, 1983. Mr. Kurkowski consulted with Richard Brean, Assistant General Counsel of the international Union in late December, 1983 or early January, 1984. Mr. Woodard told Lawrence Yocum before Mr. Kintsche was laid off that the Union was required by law to reduce the number of union functionaries with superseniority in time of significantly reduced employment.

Thus, it is clear that *before* Mr. Kintsche was laid off, Mr. Woodard, acting as representative of the international Union to the Lansdowne Morton plant, had formed the belief based upon the memorandum from Mr. Klieman and consultation with Mr. Kurkowski and directly or indirectly with Mr. Brean that rulings of the NLRB required a reduction of the number of Union functionaries with superseniority in times of significantly reduced employment. Mr. Woodard is not a lawyer. The court is satisfied that Mr. Woodard's belief was formed on the basis of a good faith effort to ascertain and evaluate the implications of Mr. Klieman's memorandum of February 18, 1982 and the NLRB rulings in *American Can Co.* and *Otis Elevator Co.* Mr. Woodard is therefore entitled to judgment in his favor.

Mr. Kurkowski, also not a lawyer, also reasonably relied on the memorandum of Mr. Klieman and the legal advice of Mr. Brean. The correctness of Mr. Brean's legal advice is questionable. In *Otis Elevator Co.* the employer announced its intention to reduce employment from 800 persons to 50, reducing the bargaining unit from 144 persons to 35. *Otis Elevator Co.*, 231 NLRB at 1128, 96 LRRM at 1108. The Union eliminated superseniority for six department stewards. *Id.* at 1128, 96 LRRM at 1109. Massive layoffs included five of the six department stewards, but fourteen Union officers, including two area stewards, remained on the job. The officers took over the work of the department stewards. *Id.* Two regular unit employees, reduced in grade because of the super-

seniority of the remaining officers, brought unfair labor practice charges against the union. A three-member majority of the NLRB held that the Union's "elimination of the department stewards was a good-faith effort to reduce its representational size to correspond with the decrease in unit size...." *Id.* However, the majority stated that it was the *role* of the union personnel, *not* their *ratio* to the workers, which entitled them to the presumption that their superseniority was lawful. *Id.* at 1130 n. 4, 96 LRRM at 1110 n. 4. Two dissenting members of the NLRB found the superseniority of the officers discriminatory within the meaning of 29 U.S.C. §§ 158(a)(3), 158(b)(2) (1947), because it had not been shown that the officers were involved in grievance processing at the plant level; those board members believed that was necessary for valid superseniority.

In *American Can Co.* the NLRB ruled 3–2 that the United Steelworkers of America had committed an unfair labor practice when it requested the employer to retain or recall a guard and a trustee with contractual superseniority but not involved in contract administration when there were layoffs of employees with greater regular plant seniority. *American Can Co.,* 244 NLRB 78, 102 LRRM 1071 (1979).

Mr. Klieman's memorandum of February 18, 1982 (Ex. D–1) cited *American Can Co.* for the proposition that superseniority may be invoked for a "reasonable number" of union officials. However, this limitation was suggested only by a passing use of the phrase "a reasonable number of union officers and grievance committeemen" in the *dissent* in *American Can Co.,* 244 NLRB at 740, 102 LRRM at 1074. (Fanning, Ch., dissenting). The *contrary* rule was stated by the majority of the NLRB in *Otis Elevator Co.,* 231 NLRB at 1130 n. 4, 96 LRRM at 1110 n. 4 (it is the role not the ratio of union functionaries that determines legitimacy of superseniority).

Mr. Klieman's interpretation of the "reasonable number" concept seems to have been based upon a somewhat questionable reading of the rulings of the NLRB. The applicability of the Klieman memoranda in to Mr. Kintsche's case is even more questionable. The memorandum of February 12, 1982 (Ex. D–1) in context postulates the "reasonable number" limit on the number of union *"officials"* or *"officers"* who can be given superseniority; it does not appear to apply that rule to grievance committee members and stewards. This interpretation is supported by the statement in Mr. Klieman's March 25, 1983 memorandum (Ex. P–A) that: "In light of *Gulton Electro-Voice,* we have taken the position that as a rule superseniority for Presidents and Vice Presidents as well as grievance committee members can probably be sustained under the new Board law on the grounds that they do perform representation duties on the job."

Mr. Brean nevertheless formed the belief that if a disproportionately or unreasonably large number of union officers or stewards had superseniority in times of significantly reduced employment this might constitute pro-union discrimination subjecting the union to potential unfair labor practice charges under 29 U.S.C. § 158(b)(2) (1947). He conveyed this legal opinion to Mr. Kurkowski and (directly or indirectly) to Mr. Woodard, and they relied upon Mr. Brean's assessment and advice in assessing and responding to Mr. Kintsche's claim to superseniority both before and after Mr. Kintsche's layoff.

Even if Mr. Brean's opinion of superseniority law was erroneous, the court cannot find that it was formed or conveyed arbitrarily, discriminatorily, or in bad faith. Mr. Klieman's memoranda stated a sincere belief shared by Mr. Brean that rulings of the NLRB were steadily decreasing the scope of lawful contractual superseniority. Although Mr. Woodard and Mr. Kurkowski were not lawyers, they were experienced union officials and shared Mr. Brean's fear of unfair labor practice charges.

Ordinary negligence by a union in handling an employee's grievance does not constitute a breach of the duty of fair representation. *Riley v. Letter Carriers Local No. 380,* 668 F.2d 224, 228 (3d Cir.1981);

*Bazarte v. United Transportation Union,* 429 F.2d 868, 872 (3d Cir.1970); *Larry v. Penn. Truck Aids, Inc.,* 567 F.Supp. 1410, 1414 (E.D.Pa.1983). Therefore, even if Mr. Brean negligently formed or conveyed his legal opinion and advice, plaintiff cannot prevail. Such conduct simply is insufficient to make out a breach of the duty of fair representation. Defendants are therefore entitled to judgment in their favor.

■ Defendants urge as an alternative ground for judgment in their favor that Lansdowne did not breach the collective bargaining agreement by laying off Mr. Kintsche. The contract provided for superseniority for *"up to* six (6) shop stewards..." Collective Bargaining Agreement, Article VIII, § 43 (June 5, 1980) (emphasis added). It did not mandate the selection of six shop stewards.

When the Union and Lansdowne negotiated the contract in 1980 there were approximately 200 to 270 employees at Lansdowne's Morton plant working in three shifts. The local Union subsequently elected six shop stewards, two for each shift. In April, 1982, when there were three shifts of workers, Mr. Kintsche was elected to serve as a shop steward by the day shift workers. During April, 1982, the eleven members of the local Union, including Mr. Kintsche, were told that the shop steward then elected would have superseniority.

The parties agree that Mr. Kintsche enjoyed superseniority from his election until January 4, 1984. Furthermore, although the size of the Morton workforce varied greatly after the collective bargaining agreement became effective, until Mr. Kintsche was laid off, no shop steward was ever denied the benefit of superseniority, even when the workers were reduced to a single shift. The Union's position that there was no breach of contract in reducing the number of shop stewards having superseniority is incorrect.

By its plain terms, the collective bargaining agreement required Lansdowne to grant superseniority to "up to six shop stewards" during layoffs. Collective Bargaining Agreement, Article VIII, § 43

(June 5, 1980). If this provision of the contract was not unlawful, the Union attempts to establish by parole evidence that Lansdowne had authority under the contract to lay off shop stewards during layoffs. This is directly contrary to the plain meaning of the agreement; the court cannot accept such an assertion, particularly since it is also entirely inconsistent with the practices of Lansdowne and the Union from 1980 until the layoff of January 4, 1984. *See Hoh v. Pepsico, Inc.,* 491 F.2d 556, 557–58 n. 2 (2d Cir.1974) (parol evidence may not be used to vary plain meaning of collective bargaining agreement). *Cf. Flintkote Co. v. Textile Workers Union of America,* 243 F.Supp. 205, 209–10 (D.N.J.1965) (parol evidence may be admitted to assist interpretation of collective bargaining agreement but not to vary or supplement its terms).

■ Defendants also argue that the collective bargaining agreement was definitely interpreted, modified, or superceded by the layoff "guideline" proposed by Emory Woodard, Jr., at the November 1, 1983 Union-management meeting and adopted by Lansdowne. Mr. Woodard was the representative of the international Union responsible for the Lansdowne Morton plant. The international Union and Lansdowne are the contracting parties of the collective bargaining agreement. It was the practice of Lansdowne and the Union to hold "cooperative" meeting regarding labor-management problems, such as the meeting of November 1, 1983.

The "guideline" proposed by Mr. Woodward could not modify or supercede the collective bargaining agreement in any way. Adopting it did not comply with the contract modification requirements of 29 U.S.C. § 158(d) (1947). It is also clear that Lansdowne and the Union did not *intend* at their November 1, 1983 meeting to modify or supercede the labor contract. Even if Mr. Woodard and the President and Vice President of Lansdowne had reached a joint interpretation of the collective bargaining agreement, the court is not bound by their conclusion. The collective bargain-

ing agreement did not provide for its conclusive interpretation except as provided by the grievance procedure. Collective Bargaining Agreement, Article VI, § 23 (June 5, 1980).

Mr. Yocum, president of the local Union, vehemently disagreed with Mr. Woodward's interpretation or construction of the collective bargaining agreement. Furthermore, Mr. Woodward's recommendations were influenced at least in part by a questionable understanding of the legal limits on superseniority established by rulings of the NLRB. In these circumstances, the court will not accept the November 1, 1983 "guideline" as a definitive or a valid interpretation of the collective bargaining agreement. The court reaches its decision in favor of defendants solely on its conclusion that Mr. Woodward and the Union did not breach their duty to Mr. Kintsche of fair representation because even if wrong they clearly acted in good faith rather than arbitrarily or discriminatorily against Mr. Kintsche.

To the extent that the foregoing Discussion contains findings of facts and conclusions of law in addition to those expressly set forth under their respective headings, they are deemed to constitute findings of fact and conclusions of law as if separately set forth.

### III. CONCLUSIONS OF LAW

Plaintiff has properly invoked the jurisdiction of this court under 29 U.S.C. § 185 (1947) in this suit for breach of the duty of fair representation by the defendant union official and Union.

Plaintiff's suit is not barred by failure to exhaust either contractual or internal Union remedies. He brought his grievance as far as he could under the collective bargaining agreement and there are no internal Union remedies which he failed to exhaust. *Cf. DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. at 163–64, 103 S.Ct. at 2290, 76 L.Ed.2d at 488–89 (exhaustion of contractual remedies excused where Union breached duty of fair representation); *Clayton v. U.A.W.,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981) (discussing where exhaustion of internal union remedies is required).

Plaintiff's suit was filed within the applicable six months' limitations period. *See Taylor v. Ford Motor Co.,* 761 F.2d 931 (3d Cir.1985).

To prevail against the Union in a suit under 29 U.S.C. § 185 (1947) for breach of the duty of fair representation the plaintiff-employees must show not only breach of the collective bargaining agreement by the employer but also breach of that duty by the Union. *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. at 165, 103 S.Ct. at 2290–91, 76 L.Ed.2d at 489.

A representative Union does not breach the duty of fair representation unless it treats a member of the collective bargaining union in a manner that is arbitrary, discriminatory or in bad faith. *Vaca v. Sipes,* 386 U.S. at 190, 87 S.Ct. at 916, 17 L.Ed.2d at 857; *Starks,* 760 F.2d at 54; *Findlay,* 639 F.2d 953 at 957 (3d Cir.1981).

Even if their interpretation of the collective bargaining agreement and federal labor law was in error, the defendant Union and union officials made a reasonable, good faith effort both before and after plaintiff's layoff to evaluate and apply rulings of the NLRB to plaintiff's claim of superseniority. Mere negligence in processing a grievance does not violate the duty of fair representation. *Riley v. Letter Carrier's Local No. 380,* 668 F.2d 224, 228 (3d Cir.1981); *Bazarte v. United Transportation Union,* 429 F.2d 868, 872 (3d Cir.1970); *Larry v. Penn. Truck Aids, Inc.,* 567 F.Supp. 1410, 1414 (E.D.Pa.1983).

Defendants are entitled to judgment in their favor.